No. 24-1214

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

RICKEY C. MENEWEATHER,

Plaintiff–Appellant,

v.

STEPHEN RITZ and MARLENE HENZE,

Defendants–Appellees.

On Appeal from a Final Order of the
United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:19-cv-6643, Hon. Matthew F. Kennelly

**BRIEF FOR APPELLANT URGING REVERSAL
AND ATTACHED APPENDIX**

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579

Counsel for Appellant

June 14, 2024

## CORPORATE DISCLOSURE STATEMENT

Appellant Rickey Meneweather is an individual, and is not a corporation. He offers no stock; there are no parent corporations or publicly owned corporations that own 10 percent or more of stock.

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ..................................................... i

Table of Authorities.................................................................... iii

Introduction ................................................................................ 1

Jurisdictional Statement .............................................................. 2

Issue Presented ........................................................................... 2

Statement of the Case .................................................................. 2

Summary of Argument................................................................. 10

Standard of Review ..................................................................... 12

Argument .................................................................................... 13

I.    The District Court correctly held that disputed issues of fact precluded summary judgment on the element of deliberate indifference. ......................... 13

II.   The District Court erred by granting summary judgment on the issue of causation........................................................................ 16

    A.   Even in the view of Appellees' own expert, Appellee Dr. Henze examined Mr. Meneweather soon enough that constitutionally adequate care could have forestalled his hearing loss............................. 17

    B.   Dr. Pollak specifically opined that both Appellees' substantial departure from the standard of care denied Mr. Meneweather the chance to avoid "permanent consequences.".............................. 22

        1.   The District Court read Dr. Pollak's expert report far too narrowly, and at minimum it creates a dispute as to causation.......................................................... 23

        2.   The District Court's narrow reading particularly runs against this Court's repeated holdings that causation should almost always go to the jury to decide. .............................. 27

    C.   Even if there were no dispute that constitutionally adequate care could have forestalled permanent hearing loss for Mr. Meneweather, the suffering he experienced because of Appellees' delay in treating him would save his claim.............................. 30

Conclusion................................................................................... 34

Certificates................................................................................... 

Attached Appendix ......................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Arce v. Wexford Health Sources, Inc.,*
  75 F.4th 674 (7th Cir. 2023)..................................................... 5, 13, 30, 31
*Cooper v. Carl A. Nelson Co.,*
  211 F.3d 1108 (7th Cir. 2000) ...................................................... 29
*Cooper v. Casey,*
  97 F.3d 914 (7th Cir. 1996) .......................................................... 33
*Dixon v. Cnty. of Cook,*
  819 F.3d 343 (7th Cir. 2016) ................................................... 30, 31
*Dunn v. Menard, Inc.,*
  880 F.3d 899 (7th Cir. 2018) ....................................................... 12
*Edwards v. Snyder,*
  478 F.3d 827 (7th Cir. 2007) ....................................................... 32
*Estate of Perry v. Wenzel,*
  872 F.3d 439 (7th Cir. 2017) ................................................... 23, 24
*FKFJ, Inc. v. Vill. of Worth,*
  11 F.4th 574 (7th Cir. 2021).......................................................... 12
*Gayton v. McCoy,*
  593 F.3d 610 (7th Cir. 2010) ..................................... 12, 24, 25, 27, 28, 29
*Gil v. Reed,*
  381 F.3d 649 (7th Cir. 2004) ....................................................... 31
*Goodloe v. Sood,*
  947 F.3d 1026 (7th Cir. 2020) ................................................. 14, 30
*Greeno v. Daley,*
  414 F.3d 645 (7th Cir. 2005) ....................................................... 13
*Grieveson v. Anderson,*
  538 F.3d 763 (7th Cir. 2008) ................................................... 28, 32
*Holmes v. Baldwin et al.,*
  No. 11-cv-2961 (N.D. Ill.) ............................................................ 6
*Jackson v. Pollion,*
  733 F.3d 786 (7th Cir. 2013) ............................................. 20, 21, 23
*Jackson v. Sheriff of Winnebago Cnty.,*
  74 F.4th 496 (7th Cir. 2023)................................ 19, 21, 22, 23, 29, 31
*Johnson v. Rimmer,*
  936 F.3d 695 (7th Cir. 2019) ....................................................... 13
*Lewis v. McLean,*
  864 F.3d 556 (7th Cir. 2017) ................................................... 13, 14
*Machiote v. Roethlisberger,*
  969 F.3d 822 (7th Cir. 2020) ....................................................... 14
*McDonald v. Hardy,*
  821 F.3d 882 (7th Cir. 2016) ....................................................... 19

## TABLE OF AUTHORITIES—continued

Page(s)

*Miranda v. Cnty. of Lake,*
  900 F.3d 335 (7th Cir. 2018) .............................................. 18, 29
*Ortiz v. City of Chicago,*
  656 F.3d 523 (7th Cir. 2011) ....................................... 23, 24, 25, 28, 29
*Perez v. Fenoglio,*
  792 F.3d 768 (7th Cir. 2015) ...................................... 13, 30, 32, 33
*Reck v. Wexford Health Sources, Inc.,*
  27 F.4th 473 (7th Cir. 2022) .............................................. 25, 32
*Roe v. Elyea,*
  631 F.3d 843 (7th Cir. 2011) .................................. 18, 20, 25, 29, 31
*Stockton v. Milwaukee Cnty.,*
  44 F.4th 606 (7th Cir. 2022) .................................. 13, 20, 28, 32
*United States v. Moshiri,*
  858 F.3d 1077 (7th Cir. 2017) .............................................. 29
*Williams v. Liefer,*
  491 F.3d 710 (7th Cir. 2007) ....................... 20, 21, 23, 25, 29, 30, 31, 32

## INTRODUCTION

Rickey Meneweather is now permanently deaf in one ear because of Appellees' constitutionally inadequate medical care during his prior incarceration. As the District Court explained, evidence showed that Defendant-Appellees Dr. Marlene Henze and Dr. Stephen Ritz respectively "disregarded an obvious explanation . . . indeed . . . the only explanation" for his symptoms, and overruled a referral to an outside medical specialist that a different doctor at Sheridan Correctional Center ordered. AR 7. The District Court correctly held that a reasonable jury could find that Mr. Meneweather's medical condition was objectively serious, and that Appellees subjectively acted with deliberate indifference.

The District Court, however, granted summary judgment to Appellees based on a view of causation that erred in its application of the summary judgment standard and under this Court's precedents about causation in the medical context. The District Court credited the causation opinion of Appellees' expert, who opined that even if Drs. Henze and Ritz had provided constitutionally adequate care, it would not have staved off Mr. Meneweather's permanent hearing loss. AR 11. But in doing so, it disregarded both the Defendant-Appellees' own expert conceding that prompt care might have forestalled permanent hearing loss, and Mr. Meneweather's own expert, who opined that Dr. Ritz had "den[ied] the plaintiff the right to obtain appropriate therapy in a timely fashion to avoid permanent consequences associated with sudden untreated sensorineural hearing loss." AR 459. On the posture, the conflicting expert opinions on causation must be construed in Mr. Meneweather's favor, and as this Court has

repeatedly emphasized as to issues of medical causation, should be resolved by a jury. This Court should reverse and reinstate so that Mr. Meneweather's case can proceed to trial.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Mr. Meneweather alleged claims pursuant to 42 U.S.C. § 1983. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as Mr. Meneweather appeals from a final judgment of the United States District Court. The order from which Mr. Meneweather appeals granted summary judgment to Appellees Henze and Ritz, *see* AR 1-12. Mr. Meneweather timely filed his notice of appeal, *see* AR 71. The appealed order was both final and adjudicated all of Mr. Meneweather's claims; no claims or parties remain for disposition in the District Court.

## ISSUE PRESENTED

Whether the District Court erred in holding that the facts in the record, including Mr. Meneweather's expert's opinion, did not create a dispute as to causation that would preclude summary judgment.

**Proposed answer: Yes**

## STATEMENT OF THE CASE

Statement of Facts

On August 20, 2018, Rickey Meneweather told a nurse at Sheridan Correctional Center that he was for the first time experiencing sudden hearing loss, tinnitus—

persistent ringing—and throbbing pressure in his right ear. AR 113. In addition to the hearing loss, when he'd woken up that morning, his ear had been bleeding. AR 111-112. Appellee Doctor Henze saw him the same day, diagnosed him with "acute otitis media," or inflammation of the middle ear, and prescribed a combined steroid/antibiotic, another antibiotic, and an antihistamine allergy medication. AR 197, AR 199-200. She did not even consider sensorineural hearing loss. AR 461, AR 464.

Unfortunately, sudden sensorineural hearing loss was, in fact, the "high priority diagnosis" that matched Mr. Meneweather's symptoms—indeed, the only one that fit them. AR 461, AR 5. He had "complained of three major factors that we see in sudden sensorineural hearing loss[:] pressure in the ear, tinnitus in the ear, and a significant decrease in hearing that couldn't be accounted for by any other findings based on the degree of loss at that time." AR 435. That presentation was "the classic triad of symptoms that we see with sudden sensorineural hearing loss." AR 447. Dr. Henze's diagnosis, in the context of Mr. Meneweather's symptoms that morning, made little sense and was neither necessary nor appropriate—the combination of sudden-onset hearing loss and tinnitus should have ruled it out. *Id.*; *see also* AR 216 (Dr. Henze responding to: "[C]an an infection cause hearing loss?" with: "A single infection? Probably not."). An examination with a tuning fork, a "three-dollar piece of equipment," AR 431, would have confirmed the sensorineural hearing loss—not least because it would have differentiated between whether the hearing loss was conductive or sensorineural. AR 448. But Dr. Henze never conducted such an examination. (She later explained that she was "not the one to decipher the cause, we

3

are there to treat the hearing loss." AR 216.) Because she missed the obvious diagnosis, she therefore did not prescribe the high-dose steroids that were "needed for sensorineural hearing loss" to possibly forestall permanent loss of hearing. AR 437-38, AR 450. And what she did prescribe "has nothing to do with treating otitis media," the diagnosis that she did make. AR 437.

Predictably, given the misdiagnosis and unsupported course of care, when Dr. Henze saw Mr. Meneweather for a repeatedly-delayed follow up on September 27, 2018, Mr. Meneweather reported that he was still experiencing hearing loss and tinnitus in his right ear. AR 440. In the face of this, Dr. Henze diagnosed "otitis externa," or inflammation and possible infection of the outer ear canal, and prescribed a set of the similar medications. AR 212. But that diagnosis, like her first, neither comported with Mr. Meneweather's symptoms nor reflected the standard of care. For one thing, because she'd still missed the sensorineural hearing loss, she still did not prescribe high-dose steroids. AR 437. Worse, the medications she did prescribe— including two steroids—"really made no sense" to plaintiff's medical expert, because they did not even treat the incorrect diagnosis that she did make. AR 440. In other words, she treated him "with multiple medications that were not consistent with his true diagnosis and inappropriate for his presumed by incorrect diagnosis." AR 464. And Dr. Henze's continued failure to provide responsive care included her declining to do any additional testing—with a tuning fork or otherwise, AR 223—or even consider a referral to a specialist. She later explained that she worried that "my colleagues would laugh at me" for having requested a referral. AR 218.

4

Even when other personnel at Sheridan Correctional Center recognized the seriousness of Mr. Meneweather's condition, Appellee Dr. Ritz stymied any efforts to get him appropriate medical care. Dr. Henze left Sheridan in October 2019, so when Mr. Meneweather's problems persisted, he saw a new physician. AR 476. On Nov. 9, 2018, Mr. Meneweather saw Dr. Christian Okezie, and reported the same symptoms—hearing loss and persistent tinnitus, which if anything was "intensifying." AR 125. Dr. Okezie immediately recognized that his condition was serious and that prior treatment had not worked, and so he attempted to refer Mr. Meneweather to specialist doctors outside of the hospital. But the state of Illinois contracted for Wexford Health Services to provide medical care at Sheridan, and Wexford does not simply follow such recommendations. AR 292. Wexford requires another doctor to review such a recommendation, *id*.[1] and during that review, Appellee Doctor Stephen Ritz denied the referral and directed the prescription of a (low-dose) steroid and Claritin as an "alternate treatment plan." AR 299. Dr. Ritz did not examine Mr. Meneweather before denying the referral and doubling down on the ineffective low-dose steroid prescription, which "didn't really have any therapeutic sense at all to them." AR 416. Like Dr. Henze's prescriptions, the treatment plans

---

[1] This Court has recently discussed this process, observing that "Wexford, however, does not refer inmates to outside providers willy-nilly. It requires referrals to offsite medical providers to be approved through a process known as 'collegial review,' in which a facility's medical director and a representative of Wexford's 'utilization committee' review the patient's medical file and the treatment request." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 674, 677 (7th Cir. 2023). In *Acre*, Wexford itself acknowledged that this process is "designed to reduce offsite care costs." *Id*.

"were not even correct or supported with the misdiagnosis that was actually given" to Mr. Meneweather. AR 425. Even worse, Dr. Ritz also subsequently denied an audiology consult, ordering that such a test would take place at Sheridan and only after following Dr. Ritz's "alternate treatment plan" for 8-12 weeks first. AR 299. Dr. Henze, after the fact, explained that she thought "he said no to the audiology because I think Dr. Ritz knew he was going to fail it." AR 280.

Contemporaneously with Mr. Meneweather's ordeal, the state of Illinois settled unrelated litigation about how people in the state's custody received treatment for conditions affecting their hearing. *See Holmes v. Baldwin et al.*, No. 11-cv-2961 (N.D. Ill.), Doc. 436-2 (entered April 23, 2018). That settlement required greater access to outside specialists. Even so, Dr. Ritz wanted to block the referral—but one persistent staffer's emails, in reference to the settlement, helped get Mr. Meneweather a visit to an outside audiologist. AR 317-321. When he finally saw that specialist in January 2019, AR 130, the audiologist confirmed what had been true all along: that he had sensorineural hearing loss in his right ear. That damage is now permanent. AR 149.

Procedural History

Mr. Meneweather filed a *pro se* complaint on October 4, 2019. AR 76. The Court initially dismissed it pursuant to the PLRA's screening process, and similarly dismissed the First Amended Complaint that Mr. Meneweather filed. In its order dismissing the FAC, however, the Court granted Mr. Meneweather's motion for appointment of counsel. AR 76-77. That counsel filed a Second Amended Complaint,

AR 79, and ultimately, the Court allowed 8th Amendment medical care claims in that complaint against Appellees Dr. Henze and Dr. Ritz to proceed. AR 82.

The Parties engaged in discovery, including, as particularly relevant to this appeal, expert discovery. Defendants retained Dr. Thomas Tami, an ENT physician who opined, among other things, that "delay in getting to the audiologist or to the otolaryngologist would have no impact on the ultimate outcome." AR 359. As to Dr. Henze in particular, Dr. Tami wrote that he believed her care was reasonable and appropriate, in part because he believed that Mr. Meneweather "was never at a risk of serious harm." AR 361. As to Dr. Ritz, Dr. Tami also felt his decision to reject the outside referral request in favor of the "alternate treatment plan" was reasonable. AR 362. He also opined that Mr. Meneweather was not harmed by Dr. Ritz's decisions because "the [sensorineural hearing loss] was already present." AR 362-63. Even so, he admitted in his rebuttal report that Dr. Ritz had "accurately testified" that treatment "could potentially reduce something that could cause sensorineural hearing loss," AR 372,[2] and bolstered this by sharing his view that evidence as to the efficacy of high-dose steroid treatment to stop or reverse sudden sensorineural hearing loss was "far from conclusive." AR 372. This aligned with his initial report, where Dr. Tami had already qualified his opinion about the futility of fixing sudden sensorineural hearing loss by acknowledging evidence that sudden sensorineural hearing loss can be treated if done within 72 hours. AR 359.

---

[2] Dr. Ritz, testified at his deposition: "if this [treatment] would have been done at this point in time, would the outcome have been different? There's no way I can answer that question." AR 301.

Mr. Meneweather retained Dr. Alan Pollak. Dr. Pollak, by contrast, opined that Dr. Henze's initial diagnosis did not match Mr. Meneweather's symptoms, that her second diagnosis was supported by no evidence in the records, and that she "clearly deviated from the standard of care" in her assessment, treatment, and decision not to refer Mr. Meneweather to a specialist. AR 464. As to Dr. Ritz, Dr. Pollak explained that his "delayed diagnosis, and failure to suggest, prescribe, and/or approve appropriate diagnostic studies in a timely fashion . . . resulted in an unnecessary therapeutic plan, an alternative treatment plan that has no scientific basis for the proposed diagnosis, and a missed opportunity for the appropriate diagnostic students and timely and effective treatment that would have minimized the physical and emotional damages suffered by Mr. Meneweather." AR 457. Dr. Pollak also specifically rebutted Dr. Ritz's suggestion that there was "no treatment for sensorineural hearing loss except hearing aids," and opined that his decisions had "den[ied] the plaintiff the right to obtain appropriate therapy in a timely fashion to avoid permanent consequences associated with sudden sensorineural hearing loss." AR 459. At his deposition, explained in a bit more detail that sudden sensorineural hearing loss could be treated by a course of high-dose steroids—a far higher dose than the low-dose steroids that both Dr. Henze and Dr. Ritz prescribed. AR 437-38. While he acknowledged that those high-dose steroids were not guaranteed to work, he noted both that they could and that occasionally they would work at least in the short term. AR 438 ("Sometimes when you stop it, the hearing gets bad again.").

When Appellees sought summary judgment, they did not dispute that sudden hearing loss amounted to a serious medical need for purposes of Mr. Meneweather's

Eight Amendment claims. AR 7. Instead, they sought judgment on the bases of deliberate indifference and causation. AR 7. The District Court observed that the issue of deliberate indifference "is hotly contested." AR 7. Given the posture, the District Court agreed with Mr. Meneweather that a reasonable jury could conclude that Dr. Henze had acted with deliberate indifference by disregarding the obvious explanation—"indeed . . . the only explanation that comported with what Mr. Meneweather reported and his signs and symptoms," AR 7—and that Dr. Ritz had by letting cost concerns override the clear need for an outside referral. AR 8.[3] On the issue, of causation, however, the District Court granted judgment to Appellees. Despite Dr. Henze having seen Mr. Meneweather on the very first day of his hearing loss—within even Defendants' expert's 72 hour window—and departed significantly from the standard of care, and despite Dr. Pollak's opinion that Dr. Ritz's delay had "den[ied] the plaintiff the right to obtain appropriate therapy in a timely fashion to avoid permanent consequences associated with sudden sensorineural hearing loss," AR 459, the District Court nevertheless held that "there is no evidence from which a reasonable jury could find that any different treatment by Dr. Henze or Dr. Ritz would have prevented or forestalled his hearing loss." AR 8.

Mr. Meneweather timely filed his notice of appeal from that judgment. AR 71.

---

[3] Mr. Meneweather's trial counsel did not file a statement of material facts in opposing summary judgment, or separate exhibits. But because "it is clear from the memorandum exactly what Mr. Meneweather is contesting," and because the posture required construing the evidence in the record in Mr. Meneweather's favor regardless, the District Court "exercise[d] its discretion to overlook counsel's noncompliance" and addressed the merits of his 8th Amendment claims on the way to granting summary judgment. AR 2.

## SUMMARY OF ARGUMENT

The District Court wrongfully granted summary judgment to Appellees because it misapplied this Court's precedents on causation and the summary judgment standard in the context of Eight Amendment medical care claims. The District Court was correct that a reasonable jury could find that both Appellees acted with deliberate indifference. But after concluding that, this Court erred on causation for several reasons. First, under even Appellees' own expert's view of sudden sensorineural hearing loss, Dr. Henze saw Mr. Meneweather soon enough that she could have forestalled some or all of his now-permanent hearing loss if she had not departed so substantially from the standard of care. Second, regardless, as to both Dr. Henze and Dr. Ritz, Dr. Pollak's expert report specifically opined that the delay in providing treatment comporting with the accepted standard of care had denied Mr. Meneweather the chance to avoid "permanent consequences," which should have foreclosed summary judgment on the issue of causation. Instead, the District Court seemingly imposed a burden to show a chance for full recovery on Mr. Meneweather, rather than recognizing that the two experts' inability to say for sure what would have happened had Mr. Meneweather been treated properly meant required the question to go to a jury. Dr. Pollak's expert report puts this case squarely in the line of this Court's precedent which has repeatedly held that causation is rarely an appropriate subject for summary judgment in Eighth Amendment medical care cases—especially when a plaintiff has obtained an expert medical opinion rather than "proceeding precariously" without one. A plaintiff offering *any* evidence that a delay in treatment exacerbates a serious condition forecloses summary judgment, and

10

expert evidence and testimony nearly always fits that bill. And finally, in any event, under this Court's precedents, even a delay in treatment that caused Mr. Meneweather physical suffering—such as experiencing persistent pressure and ringing in his ears, and untreated hearing loss prior to receiving a hearing aid—would suffice to allow him to make out his Eighth Amendment claim.

Because a reasonable jury could credit Dr. Pollak's expert medical opinion and that opinion more than suffices to create a dispute as to causation, this Court should reinstate Mr. Meneweather's case for a reasonable jury can resolve the many disputed facts that preclude summary judgment.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment *de novo. E.g., FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). In assessing the grant of summary judgment, the court views all facts in the light most favorable to the non-moving party—here, Mr. Meneweather—and may only grant summary judgment when there is no genuine dispute of material fact and the moving party deserves judgment as a matter of law. *E.g., Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). When this Court reviews a grant of summary judgment in an Eighth Amendment medical care case, "only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment on the issue of causation" be granted. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010).

# ARGUMENT

## I. The District Court correctly held that disputed issues of fact precluded summary judgment on the element of deliberate indifference.

For Eighth Amendment medical care cases, plaintiffs must show that (1) there was an objectively serious medical condition, (2) that the defendant in question knew and was deliberately indifferent, and (3) that the deliberate indifference caused the plaintiff harm. *Stockton v. Milwaukee Cnty.*, 44 F.4th 606, 614 (7th Cir. 2022). Here, Appellees conceded the first element below. As to the deliberate indifference element, a plaintiff must show that defendants "knew of and disregarded an excessive risk" to his or her health. *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017) (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The plaintiff can meet that standard for "deliberate indifference by showing that a medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Arce*, 75 F.4th at 679 (quoting *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019), internal quotation marks omitted). A plaintiff can also meet the deliberate indifference standard by offering evidence of a delay in treatment that "exacerbated the inmate's injury or unnecessarily prolonged his pain," because "even brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis*, 864 F.3d at 563 (quoting *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015)).

Similarly, this Court has also explained that failing to change course in the face of an obviously wrong diagnosis can also amount to deliberate indifference. "A physician's decision to persist with ineffective treatment and ignore a patient's

repeated complaints of unresolved pain and other symptoms can give rise to liability—or, at the very least, raise enough questions to warrant a jury trial." *Goodloe v. Sood*, 947 F.3d 1026, 1026 (7th Cir. 2020); *Machiote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) ("Persisting in a course of treatment known to be ineffective may support an inference that a medical official recklessly ignored an inmate's serious medical condition."). That's because doctors who "failed to conduct necessary tests, ignored specific treatment requests, and persisted in offering weak medication—all in the face of repeated protests that the medication was not working," *Goodloe*, 947 F.3d at 1031, have departed from the standard of care in a way that reflects deliberate indifference to the condition from which an incarcerated person suffers.

Because the District Court got this right, Mr. Meneweather need not belabor the point. But he would underscore how substantially Drs. Henze and Ritz departed from the standard of care and thus, why a reasonable jury could find in his favor on the deliberate indifference element. As the *Lewis* Court explained, even when defendants insist that they believe they provided appropriate care, "a jury reasonably could disbelieve them given [a medical expert's] unequivocal opinion that" they provided care that substantially departed from the standard of care. *Lewis*, 864 F.3d at 564. As Dr. Pollak's expert opinion and deposition testimony explained in great detail, both Appellees substantially departed from the standard of care in numerous ways.

Dr. Henze, in Mr. Meneweather's initial visit, not only failed to identify the "classic triad of symptoms that we see with sudden sensorineural hearing loss," AR 447, but missed that his "significant decrease in hearing" "couldn't be accounted for

by any other findings based on the degree of loss at that time." AR 435. Instead, she set out a course of care that made no sense even on its own terms; otitis media "is not an infectious thing" and so "most people do not treat with an antibiotic for noninfections things in adults." AR 436-37. Her second medication "has nothing to do with treating otitis media," AR 437, and the third was prescribed at a dosage below the standard of care even for what she thought she was treating. AR 437. And when Mr. Meneweather showed up at a second visit with her having made no improvement, she essentially doubled down on her initial plan by prescribing similar medications— which Mr. Menweather's expert later explained "really made no sense to me," because one was "not based on any science" and the other was "very difficult to understand" in the context of the presentation. AR 440. Worse still, even accepting Appellee's own expert's testimony that sudden sensorineural hearing loss must be caught and treated within 72 hours to have any chance of forestalling permanent hearing loss, AR 359, *see also* Section II.a., *infra*, Dr. Henze's substantial departures from the standard of care occurred at the most important moment for Mr. Meneweather. A reasonable jury could credit Dr. Pollak's expert opinion and testimony on the element of deliberate indifference.

As to Dr. Ritz, Dr. Pollak also explained that he had substantially departed from the standard of care. At depositions and in expert reports, a clear fact disagreement emerged as to whether Dr. Ritz was actually treating Mr. Meneweather, or merely playing a corporate role in "utilization management" for Wexford. But as Dr. Pollak explained, Dr. Ritz was able to overrule Dr. Okeize's proposed referral of Mr. Meneweather to an outside specialist and direct an "alternate treatment plan," and

so a reasonable jury could decide that he was in fact engaged in treating Mr. Meneweather. AR 457-58, AR 416. And like Dr. Henze, Dr. Ritz's "alternate treatment plan" included directions that "didn't really have any therapeutic sense at all to them." AR 416. Like Dr. Henze, besides missing the actual diagnosis, Dr. Ritz's prescribed treatment "modalities were not even correct or supported with the misdiagnosis that was actually given to" Mr. Meneweather. AR 425. And, ultimately, Dr. Ritz's substantially departure from the standard of care not only forced Mr. Meneweather through unnecessary and ineffective treatments, but affirmatively delayed his access to the right treatments. AR 457. Dr. Ritz's begrudging approval of his referral only in the wake of a persistent staffer citing the *Holmes* settlement, AR 317-21, only underscores this.

For all of these reasons, the District Court correctly decided that a reasonable jury could find that both Dr. Henze and Dr. Ritz subjectively provided constitutionally inadequate care for purposes of Mr. Meneweather's Eighth Amendment claims.

## II.    The District Court erred by granting summary judgment on the issue of causation.

Where the District Court erred, however, was in granting summary judgment on causation. The District Court's error is most clear as to Appellee Dr. Henze, because she saw Mr. Meneweather the very first day that he experienced symptoms of his sensorineural hearing loss. Even according to Appellees' own expert's opinion that intervention must happen within 72 hours to stave off permanent hearing loss, Dr. Henze would have had the opportunity to save Mr. Meneweather's hearing if she'd not substantially departed from the standard of care. But Mr. Meneweather need not

rely only on Appellees' own expert. Given Dr. Pollak's countervailing expert medical opinion, the District Court erred on causation regardless and as to both Appellees. Dr. Pollak's opinion specifically noted that even as late as Dr. Ritz blocking Mr. Meneweather's referral to a specialist, that decision denied Mr. Meneweather the chance to avoid "permanent consequences." AR 459. That is enough to preclude summary judgment on causation—particularly because of this Court's precedents about the rarity with which trial courts should rule on causation as a matter of law at summary judgment. And in any event, the clear suffering that Mr. Meneweather endured prior to his ultimately receiving a hearing aid would allow his claim to go forward against both Appellees.

### A.   Even in the view of Appellees' own expert, Appellee Dr. Henze examined Mr. Meneweather soon enough that constitutionally adequate care could have forestalled his hearing loss.

The District Court erred particularly starkly by concluding that no reasonable jury could conclude that Appellee Dr. Henze's substantial departure from the standard of care caused Mr. Meneweather's permanent hearing loss. In doing so, the District Court misapplied this Court's precedents on causation in the Eighth Amendment medical care context, including about the nature of the burden of proof and upon which party it falls at summary judgment. The Court also failed to construe the language of Dr. Tami's expert medical opinion and other record evidence in favor of Mr. Meneweather, as required by the posture. The fact construction errors and Dr. Tami's own testimony goes a long way toward explaining why this Court should reverse as to Appellee Dr. Henze, in particular.

The District Court seemingly imposed the burden of proof, wrongly, on Mr. Meneweather to show that earlier intervention would definitely have forestalled his permanent hearing loss. In its opinion, the District Court speculated that "there may be no good way to know for certain what would have happened if Mr. Meneweather had received the sort of treatment that Dr. Pollak opines was appropriate and consistent with the standard of care," AR 5, and faulted Dr. Pollak for not having "offer[ed] any percentage or probability evidence . . . for how often, in similar situations, prompt treatment with high-dose steroids prevents or forestalls hearing loss." AR 6. But even where "the record supports the conclusion that the long-term efficacy of [a] treatment is not known," evidence that "the treatment denied [a prisoner plaintiff] is the standard in the medical community" is enough to establish causation. *Roe v. Elyea*, 631 F.3d 843, 866 (7th Cir. 2011). A plaintiff need not show but-for causation, because an Eight Amendment plaintiff does "not, however, bear the burden of proving that but for the medical defendants' in action," the prisoner's outcome would have been different. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 347 (7th Cir. 2018). The *Miranda* Court reversed a similar grant of summary judgment for purported lack of causation because evidence of "a diminished chance" of recovery "would have been enough." *Id.*

*Miranda* followed and built upon both *Elyea* and another recent prior case in which this Court discussed the burden of proof as to causation in these cases and reversed a district court that wrongly allocated it to a prison medical care plaintiff. There, a district court had granted summary judgment to prison defendants who had revoked the low cholesterol diet of an incarcerated person, because the district court

18

credited defendants' argument that the plaintiff had "provide[d] no evidence that his cholesterol level has been affected by not having a low cholesterol diet." *McDonald v. Hardy*, 821 F.3d 882, 892 (7th Cir. 2016). But because of the underlying serious medical condition, and a prior doctor order for that diet, this Court explained that "a jury reasonably could infer" that the plaintiff "was, and continues to be, harmed by the lack" of the diet. *Id*. In explaining why a reasonable jury could make such an inference even absent direct testimony about the effect of revoking the diet, this Court further explained that the burden was on the defendants "to establish that [the plaintiff's] level of total cholesterol remained steady after his prescription diet was taken away." *Id*. In other words, the absence of absolute certainty over what would have happened if a prison medical care plaintiff received the correct care—including at a critical moment—must be construed in favor of the plaintiff and forecloses summary judgment.

Following *Elyea*, *McDonald*, and *Miranda*, just last year, this Court again reversed a district court for doing exactly what the District Court did in this case. "We only prevent a jury from deciding causation if a plaintiff can proffer *no* evidence that a delay in medical treatment exacerbated an injury." *Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 501 (7th Cir. 2023) (emphasis in original). In *Jackson*, the plaintiff did not even have a medical expert; it was enough to forestall summary judgment, however, that the *defendants*' medical expert—again, the only one in the case—"never ruled out the possibility" that "earlier medical intervention would have made a difference." *Id*. Put another way, the *Jackson* Court treated the absence of uncontroverted evidence that earlier intervention would have made no difference

19

whatsoever as sufficient to create a fact dispute about causation that a jury had to resolve. While relying solely on inferences drawn from an opposing medical expert is a "risky [litigation] strategy," a plaintiff can still prevail at trial on the issue of causation even in cases involving complicated medical issues, never mind just defeating summary judgment. *Elyea*, 631 F.3d at 865. And juries are perfectly capable of resolving those fact disputes, including in favor of plaintiffs, absent expert medical evidence. In *Williams v. Liefer*, the plaintiff did not have an expert—"[t]he only testimony from a medical expert, [the defendant's], was that they delay *did not appear* to have adversely affected [the plaintiff's] condition." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (emphasis added). But in light of other evidence in the record, and the lack of certainty of the defendant's expert report, this Court rejected judgment for the defendants there.

Cases like *Miranda*, *Elyea*, *Williams*, *McDonald*, and *Jackson* present a virtually unbroken string of precedent under which even Dr. Tami's report would preclude summary judgment as to Dr. Henze. Indeed, "one of those rare instances" in which a post-*Miranda* case allowed summary judgment on causation underscores this—that case only allowed summary judgment because the plaintiff had already literally died prior to an officer's failure to render CPR. *Stockton*, 44 F.4th at 616 (involving a claim about failure to render CPR on Oct. 28 where the plaintiff had passed away on Oct. 27). Instead, this Court has held a plaintiff must point to evidence to show causation that was either "actual or at least probabilistic." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). In other words, even a mere probability that the defendants caused the injury would preclude summary judgment. By contrast, summary judgment is

only appropriate in cases like *Stockton* where "the last possible opportunity for medical intervention" has "already passed" and the probability of causation has thus collapsed to zero. *Jackson*, 74 F.4th at 502 (discussing *Stockton*).

Here, the District Court turned the consistent string of case law that this Court discussed and reaffirmed in *Jackson* on its head. To use the language of the District Court here, even if there were "no good way to know for certain what would have happened," AR 5, such uncertainty precludes summary judgment on causation, it does not require it. To the contrary, the District Court could only have granted summary judgment if there were no chance at all that earlier intervention would not have forestalled, mitigated, or otherwise lessened Mr. Meneweather's hearing loss. And Appellees did not make that showing at summary judgment even just on the basis of their own evidence, to say nothing of Mr. Meneweather's. Even their own expert, Dr. Tami, qualified his own opinion on causation by saying that early intervention with high-dose steroids "has not been shown to *significantly* change the ultimate outcome," AR 6 (emphasis added), agreed that treatment "could potentially reduce something that could cause sensorineural hearing loss, AR 372, and opined that evidence of efficacy of high-dose steroid treatment was "far from conclusive." AR 372. None of those statements is unequivocal enough to have "ruled out the possibility" that intervention might have changed the outcome in any way. *See Williams*, 491 F.3d at 715. *Williams* is especially instructive in considering Dr. Tami's statements on causation, because like the qualifier of "did not appear" in *Williams*, Dr. Tami's hedging has not collapsed the possibility to zero and thus precludes summary judgment. *Id*.; *see also Pollion*, 733 F.3d at 790. And beyond Dr. Tami, even

Appellee Dr. Ritz himself bolstered this in his own testimony, when he responded to a question about delayed treatment for Mr. Meneweather by saying "well, if this would have been done at this point in time, would the outcome have been different? There's no way I can answer that question." AR 301.

Under the circumstances, even Appellees' own evidence should preclude summary judgment on the issue of causation—particularly starkly as to Appellee Dr. Henze, but even as to Dr. Ritz—because they have not established that timely, adequate medical treatment would have had no effect on Mr. Meneweather's ultimate outcome.

### B. Dr. Pollak specifically opined that both Appellees' substantial departure from the standard of care denied Mr. Meneweather the chance to avoid "permanent consequences."

Mr. Meneweather need not rely upon construing inferences in Dr. Tami's report for the Appellees in his favor, however, because Dr. Pollak's expert report would preclude summary judgment for both Appellees regardless. Dr. Pollak's report specifically said that Dr. Henze and Dr. Ritz substantially departing from the standard of care "den[ied] the plaintiff the right to obtain appropriate therapy in a timely fashion to avoid permanent consequences associated with sudden sensorineural hearing loss." AR 459. That statement alone creates a dispute of fact as to whether "earlier medical intervention would have made a difference." *Jackson*, 74 F.4th at 501. Because, unlike the *Stockton* plaintiff who had already died such that CPR could have made no difference under any circumstances, *both* expert opinions acknowledge the possibility that earlier intervention could have forestalled

permanent hearing loss for Mr. Meneweather, this Court must reverse the grant of summary judgment.

> **1.     The District Court read Dr. Pollak's expert report far too narrowly, and at minimum it creates a dispute as to causation.**

Causation, in this context, does not require a plaintiff "to show specific causation for a particular result; [a plaintiff] needs only to establish that the failure" to provide the relevant treatment "was unreasonable under the circumstances and that it caused [the plaintiff] some harm." *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011). As noted, evidence can be probabilistic—a plaintiff need show only a possibility that reasonable care by defendants would have prevented either his injury or his suffering. *Jackson*, 74 F.4th at 501; *Pollion*, 733 F.3d at 790. And this Court takes a broad view of what amounts to causation, especially in the prison medical care context. *Ortiz*, 656 F.3d at 545. Ultimately, as this Court observed nearly twenty years ago in a different prison medical care case involving causation, "[c]learly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement." *Williams*, 491 F.3d at 715. This is also why this Court has said repeatedly that causation should be left for the jury to decide in Eighth Amendment medical care cases. In light of the law, and in light of the law as applied to the content of Dr. Pollak's expert report and deposition testimony, the District Court erred in granting summary judgment here to both Drs. Henze and Ritz.

First, in Eight Amendment medical care cases, "the causation inquiry is quite broad." *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (quoting *Ortiz*,

656 F.3d at 545). "[I]f a plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed an inmate, there is enough causation evidence to reach a trial." *Estate of Perry*, 872 F.3d at 459 (quoting *Gayton*, 593 F.3d at 624-25). *Estate of Perry* and *Ortiz* itself are both instructive in this regard. In both cases, the parties disputed whether plaintiffs had even died of the conditions that they complained had not been treated by defendants—which defendants insisted would preclude a reasonable jury from finding in plaintiffs' favor on causation. In *Ortiz*, an arrestee with a host of background medical conditions was denied her medication while detained, but had also consumed a large quantity of heroin prior to her arrest, to hide it from police—which created "the mystery of what actually caused" her death. *Ortiz*, 656 F.3d at 535-36. The dispute in *Estate of Perry* was even worse for the plaintiff: there everyone agreed that the plaintiff died of a heart condition that was not the condition that his estate had alleged that the prison medical defendants failed to treat appropriately. *Estate of Perry*, 872 F.3d at 459. But in both cases, this Court still rejected resolution at summary judgment because of the broadness of the causation inquiry. In *Ortiz*, this Court reversed the district court's exclusion of the plaintiff's expert for (the district court thought) not opining specifically enough on causation, and it reinstated the case. *Ortiz*, 656 F.3d at 535-36. And in *Estate of Perry*, the Court sent the plaintiffs' claim to a jury because of the broadness of the causation inquiry in this context and because, on the posture, "the jury could infer that although Perry ultimately died of a heart condition," the other failures might have caused or contributed to his death. *Estate of Perry*, 872 F.3d at 459. Both cases reflect this

24

Court's broad view of causation, and preference for juries to resolve thorny factual questions pertaining to it.

Second, as discussed in Section II.a., *supra*, this Court does not require absolute certainty from a plaintiff's medical expert on the issue of causation to send a case to a jury. A plaintiff's medical expert "need not conclusively and indisputably attest to the cause" of the plaintiff's injury. *Ortiz*, 656 F.3d at 537. "As we have held on many occasions, an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome." *Gayton*, 593 F.3d at 519. "[U]ncertainty of the long-term efficacy of treatment" does not prevent "a jury from concluding that the denial of that treatment, in a specified period, resulted in an injury" to a prisoner plaintiff. *Elyea*, 631 F.3d at 867. The Court has contrasted general "expert testimony about the delay's effect" in causing harm with "a bare recitation of treatment received"—noting that the latter would not suffice but the former would. *Williams*, 491 F.3d at 715. Indeed, on the (as noted above) rare occasions that the Court affirms summary judgment on causation, the facts of such cases demonstrate just how clear cut the lack of causation must be. This Court recently discussed an ostensible "disagreement between the medical experts" as to whether prison medical defendants "should have referred [the plaintiff] directly" to a specialist to comport with the standard of care. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 484 (7th Cir. 2022). But the disagreement was illusory; the plaintiff's medical expert in that case "testified that she would have decided upon the same progression of treatment." *Id.* Under those circumstances, the plaintiff "could point to no harm to Mr. Reck as a result of Dr. Trost's decision," *id.*, one that

25

the plaintiff's own expert would have also made. Summary judgment is appropriate in cases like that where the plaintiff does not meaningfully dispute the reasonableness of the underlying conduct and associated causation.

Dr. Pollak's medical opinion could not differ more from the plaintiff's expert's opinion in *Reck*, however, and the differences explain why the District Court erred by granting summary judgment. For one thing, unlike *Reck*, Dr. Pollak identified harm to Mr. Meneweather as a result of both Dr. Henze's and Dr. Ritz's substantial departures from the standard of care. He specifically stated that even as late as Dr. Ritz denying Mr. Meneweather's scheduled referral to a specialist, Dr. Ritz had denied him the opportunity to avoid potentially permanent hearing loss. AR 459. (And of course, Dr. Pollak opining that Dr. Ritz could have saved Mr. Meneweather from permanent hearing loss demonstrates that Dr. Henze—who saw him sooner— could have, too.) He explicitly and specifically discussed (and disagreed with Dr. Tami about) the ideal window for prescribing high-dose steroids, suggesting a two-week window rather than merely 72 hours. AR 434. But even aside from that window, Dr. Pollak also noted that for patients who receive those high-dose steroids, it can sometimes help in the short term even if "sometimes when you stop it, the hearing gets bad again." AR 438. Dr. Pollak's expert report and deposition testimony would— even separately from Dr. Tami's reports and Dr. Ritz's testimony—establish a more than sufficient dispute of fact to preclude causation.

For another thing, also unlike *Reck*, Dr. Pollak's expert opinion outlined a very different course of treatment than that undertaken by Drs. Henze and Ritz. As noted, he was unequivocal about the proper course of action needed to possibly forestall Mr.

Meneweather's permanent hearing loss: a course of high-dose steroids. AR 437-38. Far from, as the plaintiff's expert in *Reck* did, agreeing that the defendant doctors' course of treatment amounted to the right medical decision, Dr. Pollak repeatedly explained that Dr. Henze's and Dr. Ritz's treatment decisions "didn't really have any therapeutic sense at all to them," AR 416, and missed the "classic triad of symptoms we see with sudden sensorineural hearing loss," AR 447, which caused them to depart substantially from the standard of care and misdiagnose Mr. Meneweather. And he went further, explaining that their treatment decisions did not even fit with their own misdiagnoses, explaining that the resulting treatment plans "were not even correct or supported with the misdiagnosis that was actually given to the patient," AR 425, "really made no sense to me," AR 440, and, especially after it had not worked initially, he "did not see any rationale as to why [similar drugs were] prescribed again." AR 439. In context, Dr. Pollak's opinion looks far different from the report in *Reck*, and precludes summary judgment on the issue of causation.

### 2. The District Court's narrow reading particularly runs against this Court's repeated holdings that causation should almost always go to the jury to decide.

The District Court's narrow view of Dr. Pollak's opinion matters particularly because this Court has repeatedly observed that causation is almost always a subject that should be left for juries to decide. This is because causation is quintessentially a factual question, particularly in the medical care context. *Gayton*, 593 F.3d at 624. As discussed in Section II.a., *supra*, this Court has underscored that repeatedly in recent years. It has done so even in cases with a plaintiff offers no medical expert

27

opinion on the subject of causation, but it has emphasized it particularly in cases where an expert doctor's opinion helps establish the dispute of fact as to causation.

First, this Court has repeatedly cautioned that summary judgment on the basis of causation is rarely appropriate in Eighth Amendment medical care cases. "[T]he causal link between a defendant's deliberate indifference and a plaintiff's injury is typically a question reserved for the jury." *Stockton*, 44 F.4th at 615 (citing *Gayton*, 593 F.3d at 624); *Ortiz*, 656 F.3d at 534 (describing summary judgment for causation as appropriate "only in the rare instance that a plaintiff can proffer no evidence" about it). And this Court has emphasized that "no evidence" really does mean no evidence whatsoever—even absent expert medical testimony, a prison medical care plaintiff who "introduced the medical records relating to his injury" had done enough to defeat summary judgment, because the information in the records "could have led a jury to infer that a delay in treatment could have unnecessarily prolonged and exacerbated his injury." *Gayton*, 593 F.3d at 625; *see also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (allowing case to go forward because reasonable jury could rule in plaintiff's favor based solely on medical records).

Where a plaintiff has offered an expert medical opinion, this Court almost universally reverses grants of summary judgment on the basis of causation. Indeed, in prior opinions reinstating cases after grants of summary judgment or even granting new trials, this Court has explained that the proper course of action for defendants who disagree with a plaintiff's medical expert is generally not to seek summary judgment on the basis of causation, but rather, "to examine the experts about what led them to draw their conclusions" before the fact finder. *Miranda*, 900

F.3d at 348; *see also Cooper v. Carl A. Nelson Co.*, 211 F.3d 1108, 1021 (7th Cir. 2000) ("The possibility of Mr. Cooper's CPS being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel."); *see also United States v. Moshiri*, 858 F.3d 1077, 1084 (7th Cir. 2017) (citing *Gayton* and observing that disagreement with expert conclusions "speaks to the weight of his testimony, not his admissibility, and is a matter ripe for cross examination"). Juries, not judges, should resolve questions about whether prison medical "defendants' inaction more likely than not contributed to" a plaintiff's injury. *Miranda*, 900 F.3d at 348.

Second, this matters here particularly because Mr. Meneweather obtained not just an expert medical opinion from Dr. Pollak, but because Dr. Pollak spoke exactly to the issue of causation. All that a plaintiff needs to establish a dispute on causation that defeats summary judgment is "verifying medical evidence to establish a causal connection" to the actions of the prison medical defendants. *Jackson*, 74 F.4th at 501; *Williams*, 491 F.3d at 714-15 (same). As noted, this Court has previously cautioned against plaintiffs "proceeding precariously" by declining to obtain an expert medical opinion, offering medical evidence without that expert context, and simply asserting that a dispute about causation is obvious enough to get to a jury anyway. *Elyea*, 631 F.3d at 865. Even then, "non-expert evidence is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm." *Ortiz*, 656 F.3d at 535; *see also Gayton*, 593 F.3d at 624 (observing that "[e]xpert testimony is not always necessary to establish causation" in prison medical care cases). But where a

plaintiff obtains an expert medical opinion, this Court almost never affirms grants of summary judgment on the basis of causation.

This case illustrates just why that is. Even the District Court professed an inability to know exactly what might have happened to Mr. Meneweather's long-term ability to hear out of one ear if Appellees had not substantially departed from the standard of care. It's a fair question—but one that this Court has repeatedly said that a jury must answer. The District Court erred by granting summary judgment, instead.

> ### C.   Even if there were no dispute that constitutionally adequate care could have forestalled permanent hearing loss for Mr. Meneweather, the suffering he experienced because of Appellees' delay in treating him would save his claim.

Regardless of whether Appellees' substantial departures from the standard of care caused, specifically, Mr. Meneweather's permanent hearing loss, that is not the only cognizable harm that would preclude summary judgment in his case. "[A] plaintiff can state a claim of deliberate indifference even if he has a condition that may not be curable." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 350 (7th Cir. 2016) (citing *Williams*, 491 F.3d at 716). This Court has repeatedly observed that prison medical defendants "still may violate the Eighth Amendment if [they are] deliberately indifferent to an unjustifiable delay that exacerbated the inmate's injury or unnecessarily prolonged" that person's physical suffering in the meantime. *Arce*, 75 F.4th at 679; *Perez*, 792 F.3d at 777-78; *Goodloe*, 947 F.3d at 1031 (noting that delay may amount to deliberate indifference "especially [] if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering"). Put another way, evidence that a delay in

providing adequate medical "caused him some harm that could have been avoided" is more than enough to make out an Eighth Amendment medical care claim, even if the harm was not outcome-determinative as to the plaintiff's serious medical condition. *Arce*, 75 F.4th at 680. Only "some degree of harm" is required, and that degree need not be too substantial. *Williams*, 491 F.3d at 714-15; *see also Jackson*, 74 F.4th at 500 (underscoring that only "some degree of harm" is required); *see also Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (discussing delay in treating an infection which therefore "required lancing and draining multiple times," and which accordingly caused "many more hours of needless suffering").

This Court's cases analyzing the degree of harm required demonstrates how little is required. For example, a plaintiff may have a viable Eighth Amendment claim even where all parties acknowledge that *no* treatment could have resolved a terminal medical issue, if the failure to attempt palliative care caused harm in the meantime. This Court addressed a plaintiff who "does not contend that he could have been cured with faster or better treatment," and allowed an Eight Amendment medical care claim to proceed despite "the possibility that the most Dr. Bonaparte might have been able to differently was to provide Dixon with six additional days of palliative care." *Dixon*, 819 F.3d at 347-48, 350. The amount of unnecessary interim suffering required to state a claim is not much; indeed, "many more *hours* of needless suffering was sufficient to withstand summary judgment," *Elyea*, 631 F.3d at 865 (quoting *Gil*, 381 F.3d at 662, and adding emphasis), and "discomfort during the relevant period [that] is attributable to the failure of [prison medical defendants] to treat [a plaintiff] consistent with" the standard of care suffices. *Id*. at 866-67; *see also Williams*, 491

F.3d at 716 (involving "six extra hours of pain and dangerously elevated blood pressure"); *see also Grieveson*, 538 F.3d at 779-80 (involving officers who delayed treatment for "one-and-a-half days after they knew about the injury" while the plaintiff was in pain). Similarly, even in *Stockton*, the aforementioned case involving a claim about CPR not performed on a plaintiff had already died, the Court still took pains to note that the defendants had not "caused [the plaintiff] additional pain or suffering" in explaining why they were affirming the District Court's judgment against the plaintiff. *Stockton*, 44 F.4th at 616. This is because if they had caused him additional suffering in the interim, even if they could not have forestalled his death, the plaintiff would still have had a viable Eighth Amendment claim.

And the law requires a lesser degree of harm when the intervention to stop it would have been easy. "Whether delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment." *Reck*, 27 F.4th at 483; *see also Perez*, 792 F.3d at 778 (discussing delay in the context of "the seriousness of the condition and the ease of providing treatment"). As the *Reck* Court observed, "[d]elay, especially when it implicates a worsening of the plaintiff's condition" can constitute an Eight Amendment violation. *Reck*, 27 F.4th at 484. And in *Perez*, this Court explained that when "the consequences of [prison medical defendants'] inaction" include "permanent" effects—there, discussing the loss of a finger in a different case—those facts "state a claim for deliberate indifference." *Perez*, 792 F.3d at 777 (citing and discussing *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007)). And perhaps most importantly, all of these items—the seriousness of the condition, the ease of the treatment, the sufficiency of a prisoner's physical suffering in the

interim—are questions of facts that a jury must decide, not a court on summary judgment. *Perez*, 792 F.3d at 778; *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996) (holding that a jury must answer "whether the plaintiffs were in sufficient pain to entitle them to pain medication" in the context of that case).

Here, the District Court erred because a reasonable jury could decide that Appellees both caused Mr. Meneweather needless suffering because of their substantial departures from the standard of care—even if they could not have forestalled his hearing loss with any treatment. First, as Mr. Meneweather himself testified, he experienced a "loud ringing in his ear"—that is, tinnitus—from the first morning of the day that he saw Dr. Henze, which was "intensifying" as time elapsed without the proper treatment. AR 113, AR 125. It was accompanied by "throbbing" pressure, which like the tinnitus actually got worse after Dr. Henze mistreated him. AR 113, AR 125. And as Dr. Pollak explained, those consequences owed to Dr. Henze and Dr. Ritz providing treatments that made no sense in light of his symptoms, instead of treatments that might have addressed them. Second, the correct diagnosis here was neither difficult nor expensive. Mr. Meneweather presented with the "classic triad" of symptoms associated with sudden sensorineural hearing loss, AR 437, which the District Court recognized would allow a jury to conclude that it should have been the only conclusion that Drs. Henze and Ritz could draw. AR 7. And diagnosing it correctly could have been accomplished either by recognizing that symptom pattern, or by utilizing a "three-dollar piece of equipment," a tuning fork, to test him. AR 431. And third, again, even—especially—if the sensorineural hearing loss was permanent the moment Mr. Meneweather walked in to see Dr. Henze on

August 20th, the delay in treating him properly and recognizing his condition delayed Mr. Meneweather from receiving a hearing aid for several months. A reasonable jury could find that his inability to hear out of one ear amounted to needless suffering sufficient for him to prevail on his claim.

## CONCLUSION

Even the District Court struggled to determine what might have happened if Mr. Meneweather had been treated properly from the outset. But that fact question precludes summary judgment and should be answered by a jury. Because even Appellees' own expert could not definitively say that Mr. Meneweather had no chance at recovering his hearing with proper treatment, because Mr. Meneweather's expert opined that prompt treatment with high-dose steroids could have forestalled his hearing loss, and because in any event the Appellees caused Mr. Meneweather needless suffering, the District Court erred. This Court should reverse the judgment of the District Court and remand for a jury to decide the key causation issues that remain in this case.

Respectfully submitted,

/s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579


Counsel for Appellant

June 14, 2024

34

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Circuit Rule 32(c) because it contains 9,307 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word version 16.85, set in Century Schoolbook font in 12-point type.

<u>/s/ Jim Davy</u>

Jim Davy

**CERTIFICATE OF SERVICE**

I certify that on June 14, 2024, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.


/s/ Jim Davy

Jim Davy

**ATTACHED APPENDIX**


**CERTIFICATE OF COMPLAINCE WITH CIRCUIT RULE 30**


In accordance with Circuit Rule 30(d), I certify that this appendix contains all of the materials required by Circuit Rule 30(a), and all of the materials required by Circuit Rule 30(b).

## APPELLANT'S APPENDIX TABLE OF CONTENTS

**Attached Appendix**

    Opinion and Order:                                                    AR 1

**Separate Appendix Vol. I**

    Operative (Second Amended) Complaint:               AR 13

    Henze Answer:                                                         AR 22

    Ritz Answer:                                                            AR 36

    Defendants' Statement of Facts at Summary Judgment:     AR 50

    Notice of Appeal                                                      AR 71

    District Court Docket                                             AR 73

**Separate Appendix Vol. II (filed under seal)**

    Exs. 1-2, Combined Meneweather Deposition:         AR 94

    Ex. 3, Henze Deposition:                                        AR 158

    Ex. 4, Ritz Deposition with email exhibit:              AR 286

    Ex. 7, Tami Report:                                              AR 322

    Ex. 8, Tami Rebuttal:                                            AR 364

    Ex. 9, Pollak Deposition and Report                      AR 386

    Ex. 10, selected Meneweather medical records      AR 469

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICKEY C. MENEWEATHER, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 6643** |
| | ) | |
| **DR. STEPHEN RITZ and** | ) | |
| **DR. MARLENE HENZE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Rickey Meneweather, who at the time relevant to this case was imprisoned at Sheridan Correctional Center, has sued two physicians, Dr. Marlene Henze and Dr. Stephen Ritz, for their actions and their inaction in treating a condition in his right ear. Mr. Meneweather lost all hearing in that ear, and the loss is permanent. The defendants have moved for summary judgment. In considering the defendants' motion, the Court views the facts in the light most favorable to Mr. Meneweather and draws reasonable inferences in his favor. *See, e.g., Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).[1]

Preliminarily, the Court notes that Mr. Meneweather's counsel did not comply with Local Rule 56.1, in that he did not file a point-by-point response to the defendants' statement of materials facts but rather simply filed a memorandum in response to the

---

[1] The Court thanks attorney Pericles C. Abbasi for his service as recruited counsel for Mr. Meneweather.

motion for summary judgment.  But it is clear from the memorandum exactly what Mr.
Meneweather is contesting.  And all the relevant evidence—the depositions of the
parties and experts, both sides' experts' reports, and the medical records—was
provided via defendants' Local Rule 56.1 submission.  The Court has carefully reviewed
all of that evidence in addressing the motion for summary judgment.  For these reasons,
the Court exercises its discretion to overlook counsel's noncompliance with Local Rule
56.1, *see, e.g., Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011), and will rule on the
merits rather than based on procedural formalities.

**Facts**

Dr. Henze first saw Mr. Meneweather—who at the time was about 35 years old—
on August 20, 2018, the same day he reported to a nurse that he had decreased
hearing in his right ear "since this morning."  Mr. Meneweather reported that he was not
in pain but that he had upper respiratory symptoms for the past several weeks that he
attributed to allergies.  Dr. Henze examined both ears using an otoscope.  She reported
in her notes that the left ear was completely normal.  Dr. Henze's notes further state:

> Right canal with some adherent cerumen and scant red blood due to
> recent traumatic removal of cerumen is appreciated.  Normal tympanic
> membrane landmark obliterated due to white posterior effusion.
> Decreased movement of the tympanic membrane.

Def.'s Ex. 10 (medical records) at ECF p. 4 of 80.[2]  Dr. Henze assessed Mr.
Meneweather as having "otitis media with effusion," in other words, inflammation of the
middle ear with some fluid, which she said resembled pus.  She prescribed Maxitrol, a
combined steroid and antibiotic, to address the inflammation and presumed infection;

---

[2] Cerumen is commonly referred to as earwax.  The tympanic membrane is commonly
referred to as the eardrum.

Bactrim DS, an antibiotic, for the same conditions; and Chlor-Trimeton, an allergy medication, to address nasal congestion.

After August 20, it appears that Mr. Meneweather was scheduled to see a physician on September 2, September 10, and September 17. However, none of these visits actually took place—the first due to a "scheduling error," and the others "due to time constraints." *Id.* at p. 6 of 80.

Dr. Henze saw Mr. Meneweather for the second and last time on September 27, 2018. Mr. Meneweather continued to report some hearing loss in the right ear. Dr. Henze noted that upon examination of his right ear, it appeared that the fluid was now clear and was no longer pus-like as it had been at the earlier visit. Dr. Henze's notes reflect that she suspected a eustachian tube dysfunction[3] and also diagnosed "mild otitis externa," inflammation and possible infection of the outer ear canal. She prescribed Maxitrol; Nasacort, an allergy medication/decongestant; and Debrox, an ear wax removal treatment.

There is no evidence that Dr. Henze at any point considered the possibility that Mr. Meneweather's condition might be serious enough to warrant further testing or a referral to an ear specialist.

Mr. Meneweather was next seen by a different physician at the prison, Dr. Okezie, on November 9, 2018. He again reported having hearing loss, as well as a "ringing noise" (i.e., tinnitus) for at least two months. Dr. Okezie's notes suggest that he suspected "chronic serious otitis media." He put in a request to have Mr. Meneweather

---

[3] The eustachian tube connects the middle ear with the nasal-sinus cavity. Its function is to balance pressure in the middle ear and to drain fluid from the middle ear.

AR 003

seen by a specialist at the University of Illinois Ear, Nose, and Throat Center.  Dr.

Okezie is not named as a defendant in this case.

The next relevant event involves "collegial review," the process undertaken by Dr.

Henze's and Dr. Okezie's employer Wexford Health Sources—which contracts to

provide medical care to imprisoned persons in Illinois—to determine whether to allow an

imprisoned person to see an outside physician.  The collegial review took place in early

or mid-November 2018, and it was done by Dr. Stephen Ritz, who is named as a

defendant.  At the time, Dr. Ritz was the Wexford's Corporate Utilization Management

Director; currently, he is Wexford's Chief Medical Officer.

Dr. Ritz reviewed Dr. Okezie's referral request, which stated as its basis the

following:  retracted, hyperemic, no light reflex, right tympanic membrane; treated twice

for otitis media; hearing loss and ringing in the right ear for two months.  Dr. Ritz

declined to approve the referral of Mr. Meneweather to a specialist.  He instead

approved an "alternate treatment plan" consisting of on-site treatment at the prison with

a course of Medrol Dosepak, a steroid used to treat inflammation; and Claritin, an

allergy medication often used as a decongestant.

On what appears from the records to be a later date in November 2018, Dr. Ritz

considered a request by Dr. Okezie for an audiology consult for Mr. Meneweather.  Dr.

Ritz instead determined that an audiology test should first be done on-site at the prison,

after 8 to 12 weeks of treatment under Dr. Ritz's "alternate treatment plan."  Dr. Ritz

ultimately approved a referral of Mr. Meneweather to an outside audiologist, but not until

mid-January 2019.  The audiologist determined that Mr. Meneweather had a

"sensorineural" hearing loss in his right ear, which means hearing loss caused by

4

AR 004

damage in the inner ear, typically nerve-related damage. Mr. Meneweather's hearing loss in his right ear is apparently permanent. He was approved for a hearing aid in late February 2019, at age 36.

Mr. Meneweather's court-appointed counsel retained an expert to review the evidence and render an opinion regarding the conduct of Dr. Henze and Dr. Ritz. The expert, Dr. Alan Pollak, is a highly experienced ENT specialist and surgeon. Dr. Pollak's report and deposition testimony reflect that he is quite critical of the care rendered by Dr. Henze and of Dr. Ritz's denial of outside specialist treatment.

Regarding Dr. Henze, Dr. Pollak says that Dr. Henze's reported findings upon her August 2018 examination were not consistent with Mr. Meneweather's report of a sudden hearing loss and the absence of any report of trauma to his ear. Dr. Pollak also notes, among other things, that the sort of acute otitis media reported by Dr. Henze is almost always associated with pain, but Mr. Meneweather reported no pain—strongly suggesting an incorrect diagnosis. Dr. Pollak also opines that Dr. Henze's prescription of Bactrim and Chlor-Trimeton was neither necessary nor appropriate "based on the clinical presentation of sudden hearing loss and tinnitus with no associated pain." Def.'s Ex. 9 (Dr. Pollak report) at ECF p. 140 of 178.

On the key issue regarding Dr. Henze, Dr. Pollak states that standard treatment guidelines indicate that "based on [Mr. Meneweather's presentation], sudden sensorineural hearing loss should have been considered initially as a high priority diagnosis." *Id.* Dr. Pollak further states that if Dr. Henze had conducted a tuning fork examination at the time, which he describes as "the standard of care," this "would have immediately distinguished a conductive hearing loss from a sudden sensorineural

AR 005

hearing loss," which would have enabled Mr. Meneweather to get appropriate care immediately. *Id.* (It appears, however, that Dr. Henze did not have access to a tuning fork at the prison.) Among other criticisms of Dr. Henze's treatment, Dr. Pollak says that her later assessment that Mr. Meneweather's hearing loss resulted from eustachian tube dysfunction is unsupported by the medical records and would not be an appropriate diagnosis for sudden hearing loss and persistent tinnitus.

Regarding Dr. Ritz, Dr. Pollak opines (among other things) that his "alternative treatment plan" had no appropriate medical basis and that Dr. Ritz bypassed obvious and available opportunities for diagnostic tests that would have shown Mr. Meneweather's actual condition—which, Dr. Pollak again says, was not an ear infection or a eustachian tube dysfunction. Dr. Pollak essentially opines that the record does not reflect any medically appropriate basis for Dr. Ritz to overrule Dr. Okezie's recommendation to refer Mr. Meneweather to an outside specialist.

Defense expert Dr. Tami disagrees with most, if not all, of Dr. Pollak's opinions. But at the present stage, the Court must view the evidence in the light most favorable to Mr. Meneweather, the non-moving party. A reasonable jury could accept Dr. Pollak's opinions and reject Dr. Tami's. So the Court sets aside Dr. Tami's opinion for present purposes, with one exception as noted below.

### Discussion

Mr. Meneweather's claim arises under the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment prohibits deliberate indifference to the serious medical needs of an imprisoned person. *See, e.g.,* Arce *v. Wexford Health Sources Inc*., 75 F.4th 673, 678 (7th Cir. 2023). The defendants do not

6

dispute that Mr. Meneweather's ear condition and reported sudden hearing loss

amounted to a serious medical condition.  So the remaining questions are whether he

has presented evidence that would permit a reasonable jury to find that the defendants

were deliberately indifferent in treating his condition and that their inadequate care

caused him harm.  *See id.*  As the Seventh Circuit stated in *Arce*:

> Deliberate indifference requires something more than negligence or even
> malpractice.  Proving deliberate indifference can be difficult in situations
> where a medical professional has provided at least some treatment in
> response to a plaintiff's complaints.  But we have rejected the notion that
> the provision of some care means the doctor provided medical treatment
> which meets the basic requirements of the Eighth Amendment.  More is
> necessary.  For example, a plaintiff may show deliberate indifference by
> showing that a medical professional's decision is such a substantial
> departure from accepted professional judgment, practice, or standards as
> to demonstrate that the person responsible actually did not base the
> decision on such judgment.

*Id.* at 678–79 (7th Cir. 2023) (internal quotation marks, brackets, and citations omitted).

The sufficiency of Mr. Meneweather's evidence to prove the defendants'

deliberate indifference is hotly contested.  But viewing the evidence, including in

particular Dr. Pollak's report and testimony, in the light most favorable to Mr.

Meneweather (as the law requires), the Court concludes that a reasonable jury could

find that their treatment decisions were such a substantial departure from accepted

standards that they reflected deliberate indifference to Mr. Meneweather's condition.

Specifically, a reasonable jury could find that Dr. Henze disregarded an obvious

explanation for Mr. Meneweather's sudden hearing loss—indeed, Dr. Pollak would say,

the only explanation that comported with what Mr. Meneweather reported and his signs

and symptoms—and instead followed treatment that, in Dr. Pollak's opinion, was (and

would be expected to be) entirely ineffective.  With regard to Dr. Ritz, a reasonable jury

AR 007

could find that his expressed concerns over cost overrode proper medical judgment and led him to overrule Dr. Okezie's referral to an outside specialist in favor of an entirely ineffectual "alternative treatment plan" that amounted to, at best, shutting the barn door after the horses had already left.

The defendants argue that little of significance may appropriately be drawn from Dr. Pollak's opinions regarding their compliance with standards of care, as he is an ENT specialist and they are not. But Dr. Pollak's testimony covered this seeming gap. He described his extensive familiarity with the treatment of ENT conditions, including reported hearing loss, by general practitioners and family medicine professionals—who typically see his patients before referring them to him. And Dr. Pollak explained in detail how he believed Dr. Henze's and Dr. Ritz's actions did not measure up to those standards. Any argument that Dr. Pollak was imposing too high a standard arguably might affect the weight to be given to his opinions by a jury, but there is no appropriate evidentiary basis to disregard his opinions entirely or exclude them from evidence.

The defendants also argue that Dr. Pollak's opinion establishes, at most, conduct that fell short of the standard of care—in other words, negligence—and not deliberate indifference. Under the law, however, conduct that represents a significant departure from the standard of care may amount to deliberate indifference because it reflects the lack of application of professional judgment. As the Court has concluded, a reasonable jury could so find in this case with respect to both Dr. Henze and Dr. Ritz.

Mr. Meneweather's Eighth Amendment claim founders, however, on the issue of causation. Specifically, there is no evidence from which a reasonable jury could find that any different treatment by Dr. Henze or by Dr. Ritz would have prevented or

8

forestalled his hearing loss.  Dr. Pollak's written report largely focuses on the

inappropriateness of the care rendered by Dr. Henze and Dr. Ritz.  On the question of

causation, Dr. Pollak's report and deposition include only the following opinions and

evidence bearing on causation:

(1)  A proper examination by Dr. Henze in August 2020—specifically, a tuning fork

examination—"would have corrected her misdirected efforts and would have provided

Mr. Meneweather the opportunity to receive the standard of care for a sudden

sensorineural hearing loss within a 72-hour window."  Def.'s Ex. 9 at ECF p. 141 of 178.

(2)  "[A]udiometric testing was not performed in a timely fashion and delayed and

prevented appropriate treatment."  *Id.* at ECF p. 146 of 178.

(3)  "[Defense expert] Dr. Tami in his own submission states 'the diagnosis of

nerve hearing loss must be made quickly so that treatment can be initiated within the

first 72 hours.'"  *Id.* at ECF p. 147 of 178.

(4)  Dr. Pollak testified as follows during his deposition:

Q:  And once a diagnosis of sudden sensorineural hearing loss is made, what
would have been the appropriate treatment?

A:  The appropriate treatment would be . . . within usually 72 hours as stated by
their own expert ideally, or two weeks is often referred to in the literature, receive
high-dose steroids with or without formal audiometric testing and then
immediately at the time it started refer for baseline formal audiometric testing.

Q:  And can a delay in the start of treatment result in permanent hearing loss that
– or can a delay forfeit the opportunity to reverse hearing loss?

. . .

A:  Okay.  The delay can obviously—delay can obviously, No. 1, prevent one
from getting adequate treatment for that disease process; No. 2, prevent
someone from getting a bunch of unnecessary treatments that aren't required
based on that diagnosis and all that goes with that.

AR 009

And so, yes, I mean you want to get it going as soon as possible, and that's certainly supported by the guidelines in 2012 and supported by the guidelines in 2019, which are based on years of literature . . . .

So the answer would be yes and certain then tell you [that] you don't need to do this, this, this, and this.

Def.'s Ex. 9 (Dr. Pollak dep.) at 248-50.

In his report, as just noted, Dr. Pollak refers to statements by defense expert Dr.

Thomas Tami.  Dr. Tami's report says the following relating the issue of causation:

> **8.**    Early medical intervention for sudden neurosensory hearing loss is controversial. First, the diagnosis of nerve hearing loss must be made quickly so that treatment can be initiated within the first 72 hours. This is difficult in even the best of settings. The most common treatment provided in this setting is corticosteroids. Steroids, even in the best of situations has not been shown to significantly change the ultimate outcome of the hearing loss. So, any delay in getting to the audiologist or to the otolaryngologist would have had no impact on the ultimate outcome. He would still have a right sided nerve hearing loss.

Def.'s Ex. 7 (Dr. Tami Report) at 37.

The Court appreciates that there may be no good way to know for certain what would have happened if Mr. Meneweather had received the sort of treatment that Dr. Pollak opines was appropriate and consistent with the accepted standard of care.  But as the Court has discussed, before Mr. Meneweather can prevail, the law requires a showing that the defendant's inadequate treatment caused him harm.  In this case, that requires Mr. Meneweather to offer evidence that would permit a reasonable jury to find not simply that he should have gotten better treatment, but that the failure to provide that treatment proximately caused his hearing loss—in other words, that it is reasonably likely that his hearing loss would have been prevented or avoided if there had been proper treatment.

Dr. Pollak's testimony falls short of this mark, and neither Dr. Tami's testimony nor

AR 010

anything else fills in the gap.  Dr. Pollak does not, for example, offer any percentage or probability evidence (supported by medical literature, his own experience, or otherwise) for how often, in similar situations, prompt treatment with high-dose steroids prevents or forestalls hearing loss.  In fact, on this point, all the record contains is Dr. Tami's statement to the contrary:  that "[s]teriods, even in the best of situations[,] ha[ve] not been shown to significantly change the ultimate outcome of the hearing loss.  So, any delay . . . would have had no impact on the ultimate outcome.  He would still have a right sided nerve hearing loss."  Def.'s Ex. 7 (Dr. Tami Report) at 37.  There is no evidence supporting the opposing proposition.

This defeats the element of causation with regard to Dr. Henze's treatment.  Regarding Dr. Ritz, Mr. Meneweather cannot establish causation for the same reason and also because, by the time Dr. Ritz reviewed the case during the "collegial review," the window that both Dr. Pollak and Dr. Tami describe for treating sensorineural hearing loss had already closed months earlier.

In sum, based on the evidence before the Court, no reasonable jury could find that the deliberate indifference of either Dr. Henze or Dr. Ritz caused injury to the plaintiff.  Specifically, it is speculative on the record before the Court whether use of appropriate testing by Dr. Henze herself, or a quick referral to an outside specialist who could do that testing, would have resulted in treatment that would have prevented or forestalled the loss of Mr. Meneweather's hearing.  The defendants are therefore entitled to summary judgment.

## Conclusion

For the reasons stated above, the Court grants the defendants' motion for

11

summary judgment [dkt. no. 112] and directs the Clerk to enter judgment stating as

follows:  Judgment is entered in favor of defendants and against plaintiff.

Date:  January 5, 2024

_____
MATTHEW F. KENNELLY
United States District Judge

AR 012