**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals
**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 19, 2024
Decided January 10, 2025

**Before**

AMY J. ST. EVE, *Circuit Judge*

JOHN Z. LEE, *Circuit Judge*

JOSHUA P. KOLAR, *Circuit Judge*

No. 24-1214

| | |
|---|---|
| RICKEY C. MENEWEATHER, JR., *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| v. | No. 19 C 6643 |
| STEPHEN RITZ and MARLENE HENZE, *Defendants-Appellees*. | Matthew F. Kennelly, *Judge*. |

**O R D E R**

Rickey Meneweather, Jr., a former prisoner who was incarcerated at Sheridan Correctional Center in Illinois, is now permanently deaf in his right ear because, he alleges, two doctors—Marlene Henze and Stephen Ritz—were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. *See* 42 U.S.C. § 1983. The district court entered summary judgment for the defendants, concluding that a reasonable jury could find that the doctors acted with deliberate indifference, but

there was insufficient evidence that their actions caused Meneweather's permanent hearing loss. We affirm.

We recount the facts in the light most favorable to the nonmoving party. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). On August 20, 2018, Meneweather awoke with blood on his pillow and throbbing pain, pressure, and ringing in his right ear. The same day, Meneweather saw Dr. Henze (Sheridan's medical director and an employee of Wexford Health Sources) and reported hearing loss. Dr. Henze believed that Meneweather had an ear infection caused by environmental allergies. She prescribed ear drops containing a combination of steroid and antibiotic medications and gave him a nasal decongestant. Meneweather was scheduled for a follow-up appointment about two weeks later, but it was postponed multiple times because of scheduling errors and availability constraints.

At the end of September, Dr. Henze saw Meneweather for a second time, and he was unable to hear in his right ear. At this point, Dr. Henze believed that the infection had cleared up and attributed the hearing loss to inflammation and possible infection of the outer ear canal. Dr. Henze prescribed more ear drops, a corticosteroid spray, and an earwax softener. Dr. Henze did not consider referring Meneweather to an Ear, Nose, and Throat (ENT) specialist on either occasion.

Meneweather's condition did not improve, and in November, he saw a new doctor, who requested that Meneweather be referred to an ENT specialist because of his ongoing hearing loss. Dr. Stephen Ritz, a Wexford administrator, was responsible for reviewing requests for specialist referrals at Sheridan. Such referrals undergo a "collegial review" process, which allows outside referrals only if an alternative on-site treatment plan is not appropriate. Dr. Ritz denied the referral request because he believed that Meneweather's hearing loss was the result of an infection and could be appropriately treated on-site. Instead of sending Meneweather offsite, Dr. Ritz instituted an alternative treatment plan that prescribed a different steroid and allergy medicine. He also denied a request to refer Meneweather for an external audiology examination, instead requiring the testing to occur at the prison once Meneweather had tried the alternative treatment plan for several weeks.

Meneweather's hearing loss, ringing, and pressure in his right ear continued. In January 2019, after an audiology test confirmed the hearing loss, Dr. Ritz finally approved a referral for Meneweather to see an ENT specialist. The ENT specialist determined that Meneweather had sensorineural hearing loss, which occurs when a

person has problems with the structures and nerves in his middle ear. The specialist could not determine the exact cause of the sensorineural hearing loss, but potential causes included aging, congenital problems, infection, trauma, or loud noise exposure. Because it was too late to prevent permanent hearing loss, Meneweather (who was 35 years old) received a hearing aid from the specialist. Meneweather still experiences ringing and hearing loss in his right ear.

Meneweather sued Dr. Henze and Dr. Ritz under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to his serious medical needs by delaying proper medical care for his ear in violation of his Eighth Amendment rights. (Wexford was dismissed from the case early on, and that ruling is not at issue.) After discovery, the defendants eventually moved for summary judgment.

To support his claim, Meneweather offered Dr. Allan Pollak as an expert witness. In his deposition, Dr. Pollak testified that Dr. Henze's method of diagnosing Meneweather's hearing loss was far below the standard of care. According to Dr. Pollak, the standard of care is for doctors to use a tuning fork to determine if a patient's hearing loss is sensorineural. If Dr. Henze had used a tuning fork on Meneweather, Dr. Pollak asserts, she would have realized that Meneweather was suffering from sensorineural hearing loss. Furthermore, Dr. Pollak continued, Meneweather presented the "classic triad of symptoms" of sensorineural hearing loss at his August 20 session with Dr. Henze—ringing, decreased hearing, and pressure.

Dr. Pollak also testified as to the proper course of treatment. In his view, to avoid permanent hearing loss, sensorineural hearing loss must be treated by high-dose oral corticosteroids within 72 hours (as the defendants' own expert, Dr. Thomas Tami, believed) or at most two weeks (which, according to Dr. Pollak, is what the medical literature indicated). Although Dr. Henze had prescribed ear drops containing a corticosteroid within that time frame, Dr. Pollak opined, the dosages were too low to successfully treat Meneweather's sudden sensorineural hearing loss.

Turning to Dr. Ritz, Dr. Pollak believed that Dr. Ritz's decision to recommend an alternative onsite treatment plan rather than referring Meneweather to an outside specialist was motivated by his desire to save money. As Dr. Pollak saw it, Dr. Ritz also deviated from the standard of care by incorrectly interpreting the medical records and devising an inadequate treatment plan based on Dr. Henze's incorrect diagnosis.

Finally, in his expert report, Dr. Pollak also discussed *Holmes v. Baldwin et al.*, No. 11-c-2961 (N.D. Ill. Apr. 23, 2018), a class action lawsuit that ended in an April 2018 settlement, under which the State of Illinois was required to provide greater access to specialists for prisoners presenting with hearing loss. Dr. Pollak explained that the *Holmes* settlement put Dr. Henze and Dr. Ritz on notice of the need to refer Meneweather to a specialist after his first examination. In Dr. Pollak's view, Dr. Henze's incorrect diagnosis and Dr. Ritz's refusal to approve the referral request delayed Meneweather's ability to receive medical treatment that could have prevented his permanent hearing loss.

For his part, Dr. Thomas Tami disagreed with Dr. Pollak's criticism of Dr. Henze's diagnostic methodology. He also testified that Dr. Pollak's recommended treatment "even in the best of situations has not been shown to significantly change the ultimate outcome of the hearing loss." Thus, Dr. Tami continued, "any delay in getting to the audiologist or to the otolaryngologist would have had no impact on the ultimate outcome. [Meneweather] would still have a right sided nerve hearing loss."

Ultimately, the district court determined that a reasonable jury could find that Dr. Henze and Dr. Ritz were deliberately indifferent to Meneweather's serious medical needs. It concluded, however, that no reasonable jury could conclude from the evidence that the doctors' actions caused Meneweather's hearing loss.

On appeal, Meneweather primarily argues that he presented sufficient evidence of causation for his claim to survive summary judgment. We review a summary-judgment decision de novo. *Petties*, 836 F.3d at 727.

To determine whether a reasonable jury could conclude that Dr. Henze or Dr. Ritz violated Meneweather's Eighth Amendment rights, we ask whether Meneweather suffered from an objectively serious medical condition and whether either doctor was deliberately indifferent to that condition. *Id.* at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Beyond that, a plaintiff must also offer some medical evidence to support a causal connection between a delay of medical care and the harm in question. *Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 500–01 (7th Cir. 2023). Meneweather rightly notes that, generally speaking, causation is a fact-intensive inquiry better suited for trial than summary judgment. *Id.* at 501. But a plaintiff claiming injury has the burden to offer some evidence of causation however sparse, especially when a defendant contests causation with their own evidence.

No. 24-1214                                                                                              Page 5

Here, Meneweather did not meet this burden. He argues that causation is a quintessential factual question for a jury, and that the district court imposed too high a burden on him to quantify the probability that proper treatment would have saved his hearing. As to Dr. Ritz, however, no reasonable jury could infer causation from the evidence in the record. Both experts agreed that—assuming aggressive corticosteroid treatment is effective to prevent permanent hearing loss—there is a short 72-hour to two-week window to administer it. It is undisputed that Dr. Ritz had no knowledge of Meneweather's condition until November 2018 at the earliest, more than two months after Meneweather first exhibited the symptoms of sensorineural hearing loss. Therefore, there was nothing Dr. Ritz could have done to prevent Meneweather's permanent hearing loss.

As for Dr. Henze, Meneweather is correct that, to survive summary judgment, he only needed to provide some medical evidence that Dr. Henze's failure to act quickly adversely affected or exacerbated his condition. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). But, according to Dr. Tami, even if Dr. Henze had administered high-dose steroids as Dr. Pollak recommended, it would not have changed the outcome. Dr. Pollak supplied nothing to rebut that conclusion. Nowhere does Dr. Pollak opine that, if Dr. Henze had prescribed corticosteroids within the treatment window, Meneweather would likely have avoided permanent hearing loss. His report, for example, states only that Dr. Henze's actions took from Meneweather "the opportunity to receive the standard of care for a sudden sensorineural hearing loss within a 72-hours window." Dr. Pollak never asserts that Dr. Henze's actions caused (or even likely caused) Meneweather's hearing loss. Thus, neither Dr. Pollak's report or deposition "tends to confirm or corroborate a claim that the delay was detrimental." *Id*.

Finally, Meneweather argues that even if Dr. Henze and Dr. Ritz could not have prevented his permanent hearing loss, the needless suffering he experienced because of the six-month delay in receiving a hearing aid was its own injury. But Meneweather did not develop this argument below in his response to the motion for summary judgment. Because his argument was not "entirely clear on this point," it is waived. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016).

Finally, the defendants dispute the district court's conclusion that a reasonable jury could find that Dr. Henze and Dr. Ritz acted with deliberate indifference. But because we affirm the district court's judgment on causation, we need not address that issue.

                                                                                                    AFFIRMED